```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-12-16
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TERRI ANN STEPHENSON,                    :
:
                          Plaintiff,     :        **OPINION AND ORDER**
          - against -                    :
:                **14-CV-8132 (RLE)**
CAROLYN W. COLVIN,                       :
**Acting Commissioner of Social Security,** :
:
                          Defendant.     :

**RONALD L. ELLIS, U.S.M.J.:**

## I.       INTRODUCTION

Plaintiff Terri Ann Stephenson ("Stephenson") commenced this action under the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3)), to challenge the final

decision of the Commissioner of Social Security (the "Commissioner") denying her claim for

disability benefits.  On November 20, 2014, the Parties consented to the jurisdiction of the

undersigned pursuant to 28 U.S.C. § 636(c).  (Doc. No. 7.)  On April 14, 2015, Stephenson filed

a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, asking the Court to remand the case for reconsideration of the evidence.  (Doc. No.

13.)  Stephenson raises four issues: (1) the Administrative Law Judge ("ALJ") violated the

treating physician rule; (2) the ALJ improperly determined Stephenson's residual functional

capacity ("RFC") before assessing her credibility; (3) the ALJ failed to properly evaluate

Stephenson's credibility; and (4) the ALJ's determination that Stephenson could perform past

work was not supported by substantial evidence.  (Plaintiff's Memorandum of Law in Support

("Pl. Mem.") at 14.)  On June 1, 2015, the Commissioner moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to affirm the

Commissioner's decision and dismiss the Complaint.  (Defendant's Memorandum of Law in Support ("Def. Mem.") at 4.)  For the reasons set forth below, Stephenson's motion is **GRANTED**, and the case is **REMANDED** for further proceedings before the Social Security Administration.

## II.    BACKGROUND

### A.    Procedural History

On February 24, 2012, Stephenson filed an application for Social Security Disability Insurance Benefits (SSDIB), alleging an inability to perform any substantial gainful activity beginning July 29, 2011, because of degenerative disc disease and osteoarthritis[1] of the lower spine, spondylosis,[2] obesity, asthma, hypertension, and diabetes mellitus.[3]  (Pl. Mem. at 3-4.) The Social Security Administration denied her claim on May 4, 2012.  (Transcript of Administrative Proceedings ("Tr.") at 88-94.)  On May 11, 2012, Stephenson filed a written request for a hearing before an ALJ.  (Tr. at 23-25.)  On January 29, 2013, Stephenson appeared for a hearing before ALJ Robert Gonzalez.  (Tr. at 45-87.)  On February 21, 2013, the ALJ considered the case *de novo*, finding Stephenson was not disabled under the Social Security Act. (Tr. at 40.)  On March 22, 2013, Stephenson requested review of the ALJ's decision.  (Tr. at 23-

---

[1] Osteoarthritis is a chronic degenerative joint disease characterized by the breakdown of joint cartilage.  It usually affects the hands, knees, hips, or spine. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/arthritis_and_other_rheumatic_diseases/osteoarthriti s_85,p00061/ (last visited Aug. 1, 2015).

[2] Spondylosis is a type of arthritis that affects the neck.  Normally, soft disks between the vertebrae, the bones in the spine, provide cushioning.  With spondylosis, these disks become compressed, leading to pain, numbness, and stiffness. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/nervous_system_disorders/cervical_spondylosis_13 4,17/ (last visited Aug. 1, 2015).

[3] Diabetes Mellitus is a type of diabetes that appears specifically during pregnancy. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/diabetes/gestational_diabetes_85,p00337 (last visited Aug. 1, 2015).

25.) On August 25, 2014, the Appeals Council denied Stephenson's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 1-6.)

**B.      ALJ Hearing and Evidence**

### 1.  Stephenson's Testimony

Terri Ann Stephenson was born on June 4, 1964. (Tr. at 151.) After finishing high school, she earned an associate's degree in human services, with an emphasis on psychology. (Tr. at 49.) Stephenson pursued online course options with Liberty University to obtain a bachelor's degree, but was held back by financial hardship. (*Id.*) Stephenson worked as a cashier on-and-off from 1997 to 2008. (Tr. at 160-64.) She was fired from her most recent cashier job at Wal-Mart when she had an altercation with another employee. She began driving a taxi in 2009. (Tr. at 67-69.)

Stephenson injured her back in October 2009, while exiting a taxi. (Pl. Mem. at 4.) She continued working as a taxi driver despite lower back pain, but further injured her back on July 29, 2011, when another driver crashed into her car. (*Id*; Tr. at 64-65.) After Stephenson's July 2011 accident, her pain was so severe that she stopped working entirely. (Tr. at 51.) From January until December 2012, she collected workers' compensation of seventy-six dollars ($76) per week from the New York State Insurance Fund. (*Id.*) Stephenson applied to Vocational and Educational Services for Individuals with Disabilities[4] (VESID) to finish her bachelor's degree via online classes, but specified in her application that she could not sit down for extensive periods of time without her legs becoming numb. (Tr. 52-53.) VESID offered Stephenson computer classes, but she had already taken similar classes in college. (*Id.*) VESID offered to

---

[4] VESID offers access to a full range of employment and independent living services for people with disabilities. VESID (Aug. 1, 2015), http://www.acces.nysed.gov/vr/.

submit grants to pay for some of Stephenson's classes, but she never obtained approval. (*Id.*) Ultimately, Stephenson did not take any VESID classes. (*Id.*)

Stephenson began seeing Dr. Barry Scheinfeld on November 2, 2009. (Tr. at 62-64; Tr. at 551.) Initially, Dr. Scheinfeld prescribed Percocet and Naproxen to control Stephenson's pain and numbness that caused her legs to "fall asleep." (Tr. at 64.) Stephenson testified that Dr. Scheinfeld did not want to give her any more physical therapy because it irritated the nerve from where her pain emanated, and that he was trying to keep her medication "down to a minimum." (Tr. at 62.)

The New York State Workers' Compensation Board had compared Stephenson's decision to attend school with a readiness and willingness to go to work, but Stephenson indicated to the ALJ that the analogy was inaccurate because home schooling would allow her to work despite her pain, whereas a job would not. (Tr. at 77-78.) Stephenson testified that she tried to remain active and maintain a positive outlook despite her pain. (Tr. at 79.) She tightened her muscles when sitting, carefully rode her bicycle three times per week for ten minutes, and slowly walked from one side of her apartment complex to the other for exercise. (Tr. at 79-82.)

### 2. Medical Evidence

#### a. First back injury (October 29, 2009 – June 6, 2011)

On October 29, 2009, Stephenson injured her back exiting a taxi. (Tr. at 671-72.) She went to the Catskill Regional Medical Center that day. Attending physician, Dr. Bryan Kurtz,

4

recorded no history of back problems, and discharged Stephenson with Toradol[5] and Flexeril[6] prescriptions.  (Tr. at 677-78.)

On November 2, 2009, Dr. Scheinfeld determined that Stephenson was thirty-three percent (33%) disabled because of a displaced lower intervertebral disc[7], both thoracic[8] and lumbar[9] sprains and strains, and lower leg joint pain.  (Tr. at 551-53.)  Between September 16, 2010, and June 6, 2011, Stephenson saw Dr. Scheinfeld twelve times.  (Tr. at 497-529.) Stephenson generally reported that her pain was controlled.  (*Id.*)  She often walked with a normal gait, used a bicycle for exercise, and continued working full time.  (*Id.*)  However, Stephenson sometimes experienced pain at night, leading her to walk with a slow and stiff gait, abstain from work, and rely on a cane.  (*Id.*)  On June 6, 2011, Dr. Scheinfeld recommended that Stephenson receive physical therapy.  (Tr. at 398.)

Dr. Scheinfeld consistently evaluated Stephenson as fifty percent (50%) disabled, diagnosing an annular disc tear associated with nerve pain in the lower back, loss of a normal lumbar lordosis,[10] and lower tenderness adjacent to the vertebrae.  (Tr. at 397-529.)  Beginning

---

[5] Toradol (Ketorolac) is used to relieve moderately severe pain, usually after surgery. *Ketorolac*, MEDLINEPLUS (Sept. 15, 2015), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html.

[6] Flexeril (Cyclobenzaprine) is a muscle relaxant.  It is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. *Cyclobenzaprine*, MEDLINEPLUS (Oct. 1, 2010), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited Nov. 25, 2015).

[7] The intervertebral disc forms a cartilaginous joint between the vertebrae to provide shock absorption. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/physical_medicine_and_rehabilitation/glossary_-_physical_medicine_and_rehabilitation_85,P01158/ (last visited Aug. 1, 2015).

[8] The thoracic spine refers to the upper back and middle back. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.spine-health.com/conditions/spine-anatomy/thoracic-spine-anatomy-and-upper-back-pain (last visited Aug. 1, 2015).

[9] The lumbar spine refers to the lower back, where the spine curves inward toward the abdomen. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.spine-health.com/conditions/spine-anatomy/lumbar-spine-anatomy-and-pain (last visited Aug. 1, 2015).

[10] Lordosis is a spinal curve. *See Health Library,* JOHNS HOPKINS MEDICINE, http://www.healthline.com/symptom/lordosis (last visited Aug. 1, 2015).

July 8, 2010, Dr. Scheinfeld prescribed 7.5 to 325 mg of Percocet two times per day to manage pain, and eventually increased the dosage to four times per day. (Tr. 536-38.)

### b.   First car accident (January 18, 2011 – February 4, 2011)

On January 18, 2011, Stephenson was involved in a car accident. (Tr. at 826.)  At the emergency room, Dr. Carlos Holden diagnosed her with a scalp contusion, but discharged her after determining that she was in stable condition. (Tr., 671-74.)  On February 4, 2011, Physician's Assistant Dennis Waxman ("PA Waxman") diagnosed Stephenson with post-concussion syndrome. (Tr. at 827.)

### c.   Second car accident (July 29, 2011 – January 23, 2012)

On July 29, 2011, Stephenson was involved in a second car accident while driving a taxi. (Tr. at 700.)  Dr. James Cameron evaluated her at the emergency room, and concluded that she was not a surgical candidate because she exhibited only mild degenerative changes and no acute pathology.  (Tr. at 680-84.)

Stephenson saw her primary care physician, Dr. David Schwalb, on August 3, 2011. (Tr. at 700.)  He determined that she had chronic pain that had been exacerbated by the car accident on July 29, 2011.  (*Id.*)  Three physical therapists at the Catskill Rehabilitation & Sports Medicine Center evaluated Stephenson twelve times during August and September 2011, and concluded independently that she was between seventy-five percent (75%) and one hundred percent (100%) impaired.  (Tr. at 451-88.)  Each medical professional performed physical tests to determine the severity of Stephenson's injuries, including strength tests on her upper and lower extremities, range-of-motion tests on her shoulders, pin pricks to determine neurological sensation, and a specialized Patrick Test[11] on her hips.  (*Id.*)  On September 6, 2011, Dr.

---

[11] The Patrick Test determines the presence or absence of sacroiliac joint disease.  The sacroiliac joint lies below the lumbar spine, right above the tailbone (coccyx).  As the patient faces upward, the doctor flexes the hip and knee, and

Scheinfeld agreed that Stephenson's chronic condition had worsened, and determined that she was between 75% and 100% impaired, although none of her tests showed signs of physical damage. (Tr. at 453.)

On September 15, 2011, an electromyography[12] (EMG) of Stephenson's back revealed no evidence of lumbar radiculopathy.[13] (Tr. at 447.) Further, on September 16, 2011, although an MRI showed Stephenson had degenerative disc disease, osteoarthritis of the lumbar spine, and mild irregularity of the nerve root of the cauda equina,[14] she had neither significant neural foraminal narrowing,[15] central canal stenosis,[16] nor any fluids to suggest irregularity in her nerve roots. (Tr. at 705-06.) On October 26, 2011, at the Hudson Valley Brain & Spine Surgery facility, Dr. Jeffrey Degen noted that Stephenson's left hip flexion[17] was slightly limited by pain. He also noted that a "Patrick's Test" indicated pain and potential sacroiliac disease in her left knee, but concluded that Stephenson was not a surgery candidate. (Tr. at 819.)

On November 8, 2011, Stephenson saw Dr. Charles Brown, a physician at the Catskill Rehabilitation and Sports Medicine Center. (Tr. at 492.) Although Dr. Brown diagnosed

---

the external anklebone is placed above the kneecap of the opposite leg. Ordinarily the test is not painful, but on depressing the knee, pain is promptly elicited in sacroiliac disease. *See Patrick Test*, FARLEX PARTNER MEDICAL DICTIONARY (Aug. 13, 2015), http://medical-dictionary.thefreedictionary.com/Patrick+test.

[12] An Electromyography (EMG) utilizes electrodes to assess muscle health. *See Electromyography (EMG)*, MAYO CLINIC (Aug. 13, 2015), http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014183.

[13] Lumbar radiculopathy (herniated disk) occurs when all or part of a disk is forced through a weakened part of the disk, which may place pressure on nearby nerves or the spinal cord. C. Benjamin Ma, M.D., et al., *Herniated disk*, MEDLINEPLUS (Sept. 8, 2014), https://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited Nov. 25, 2015).

[14] Cauda equina is the collection of nerves at the end of the spinal cord. *See* C. Benjamin Ma, M.D., et al., *Cauda equina,* MEDLINEPLUS (Sept. 8, 2014), https://www.nlm.nih.gov/medlineplus/ency/imagepages/19504.htm (last visited Nov. 23, 2015).

[15] Neural formina is the narrowing of the openings where spinal nerves leave the spinal column. C. Benjamin Ma, M.D., et al., *Spinal stenosis*, MEDLINEPLUS (Sept. 8, 2014), https://www.nlm.nih.gov/medlineplus/ency/article/000441.htm (last visited Nov. 25, 2015).

[16] Spinal stenosis (central stenosis) is the narrowing of the spinal column that causes pressure on the spinal cord. *See supra*, note 15.

[17] Flexion is the act of bending or flexing. *Flexion*, MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH, Seventh Edition (Aug. 13, 2015), http://medical-dictionary.thefreedictionary.com/flexion.

Stephenson with lumbar disc displacement, he concluded that 100% of her impairment was temporary. (*Id.*) On November 10, 2011, Stephenson had an initial pain management consultation with Dr. Hussein Omar. (Tr. at 636.) He concluded that Stephenson had a history of back pain, limited flexion, and bulging discs at her L4 and L5 vertebrae, leading to an approval plan for epidural shots and a Transcutaneous Electrical Nerve Stimulator (TENS) unit.[18] (*Id.*)

Dr. Michael Miller, an orthopedic surgeon with UMC Medical Consultants, independently evaluated Stephenson on November 15, 2011. (Tr. at 729-32.) Dr. Miller did not perform a function-by-function assessment. (*Id.*) He observed that while Stephenson had tenderness, she exhibited no apparent distress or spasms, and she walked normally. (*Id.*) Dr. Miller concluded that, although Stephenson had aggravated her medical condition, she was at maximum medical improvement from acupuncture, physical therapy and chiropractic treatment, and was mildly disabled. (*Id.*)

### d.  Medical care after filing for Title II benefits

On February 6, 2012, Stephenson filed for Title II disability benefits, alleging disability beginning July 29, 2011, the date of her second car accident. (Tr. at 149.) On February 9, 2012, she visited the Pain Control Center for Interventional Pain Management. (Tr. at 639-40.) Dr. Hussein Omar diagnosed Stephenson with lumbosacral spondylosis[19] without myelopathy,[20]

---

[18] A TENS Unit sends an electrical current through the skin for pain control. The unit is usually connected to the skin using two or more electrodes. A typical battery-operated TENS unit is able to modulate pulse width, frequency and intensity. "TENS Unit", *Alternative Treatments*, SPONDYLITIS ASSOCIATION OF AMERICA, http://www.spondylitis.org/Learn-About-Spondyloarthritis/Alternative-Treatments#.Vd8XiJftpgg (last visited Nov. 25, 2015).

[19] Lumbosacral spondylosis describes common, age-related degeneration in the lower back at the site where the last vertebra of the lumbar spine (L5) and the first vertebra of the sacral spine (S1) connect. *Spondylosis*, LASER SPINE INSTITUTE (Aug. 13, 2015), https://www.laserspineinstitute.com/back_problems/spondylosis/lumbosacral/.

[20] Myelopathy is damage to the spinal cord due to injury or disease. *See Health Library*, JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/nervous_system_disorders/neurological_disorders_2 2,myelopathy/ (last visited Aug. 1, 2015).

muscle pain, neuritis,[21] and radiculitis.[22]  That same day, Dr. Omar administered epidural steroid injections to alleviate Stephenson's pain.  (*Id.*)  On February 22, 2012, Stephenson had a follow-up visit at the Pain Control Center.  (Tr. at 641.)  Dr. Mahmoud Abu-Ghanam noted that Stephenson showed no apparent distress and only midline[23] tenderness, but he scheduled epidural steroid injections for pain.  (*Id.*)  On March 22, 2012, Dr. Abu-Ghanam gave Stephenson epidural injections, rating her improvement at seventy percent (70%) to eighty percent (80%).  (Tr. at 872-73.)  He reported Stephenson had zero percent (0%) work impairment.  (Tr. at 874-75.)

On April 20, 2012, the Division of Disability Determination referred Stephenson to Dr. Ammaji Manyam at Industrial Medicine Associates.  (Tr. at 651-54.)  Dr. Manyam stated that Stephenson was not distressed, that she walked normally, squatted fully, rose from her chair easily, and that she had "no limitations to physical activities of prolonged sitting, standing, climbing stairs, pushing, pulling, and carrying weight.  (*Id.*)  Stephenson reported her pain as an eight out of ten (8/10).  (*Id.*)

On April 25, 2012, Dr. Lawrence Liebman performed an X-Ray of Stephenson's spine, and noted degenerative changes and straightening of the lumbar spine, but no compression fracture.  (Tr. at 655.)  Dr. Aaron Sasson performed a second MRI at Middletown Medical on August 22, 2012, which yielded the same results.  (Tr. at 868-69.)

---

[21] Neuritis is inflammation of the nerves. *Neuritis*, FARLEX FREE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/neuritis (last visited Nov. 25, 2015).

[22] Radiculitis is inflammation of a spinal nerve root, especially of the portion of the root that lies between the spinal cord and the spinal canal. *Radiculitis*, FARLEX FREE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/radiculitis (last visited Nov. 25, 2015).

[23] The midline is the imaginary line that divides the body into left and right halves. *See Midline*, MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH, Seventh Edition (Aug. 13, 2015), http://medical-dictionary.thefreedictionary.com/midline.

On May 23, 2012, and July 2, 2012, Dr. Scheinfeld saw Stephenson for her pain.  At both visits, he reported swelling and tenderness, and some of Stephenson's Patrick Tests indicated hip joint pain.  (Tr. at 739-42.)

### e.   Medical care after Social Security filing (May 11, 2012 – January 23, 2013.)

On May 11, 2012, Stephenson requested a hearing before an ALJ.  (Tr. 101-02.)  On July 3, 2012, at the Catskill Rehabilitation & Sports Medicine Center, Dr. Scheinfeld performed an EMG, revealing radiculopathy in Stephenson's L5 vertebrae and nerve problems in her left lateral quadrant.  (Tr. at 743-44.)  In September 2012, Stephenson asked both Dr. Scheinfeld and PA Waxman to write prescriptions for a scooter because she had difficulty walking long distances.  (Tr. at 849.)  PA Waxman recommended Stephenson follow up with Dr. Scheinfeld to write the prescription.  (*Id.*)  Dr. Scheinfeld declined to prescribe the scooter but did not explain why.  (*Id.*)  Stephenson attended physical therapy at the Catskill Rehabilitation & Sports Medicine Center from September 24, 2012, through October 22, 2012.  (Tr. at 793-814.)  Although Stephenson sometimes reported worsened pain, the session notes suggest Stephenson had a positive response to therapy.[24]  (*Id.*)

On December 18, 2012, Dr. Miller independently evaluated Stephenson a second time.  (Tr. at 882-85.)  He determined that 80% of Stephenson's condition was pre-existing, and that she was able to do light work.  (*Id.*)  Dr. Miller diagnosed Stephenson with a lower spinal "strain, sprain, or aggravation of previously symptomatic condition with degenerative disease and osteoarthritis of the lumbar spine."  (*Id.*)  He concluded that Stephenson's soft tissue spinal

---

[24] Some examples of Stephenson's positive response to physical therapy include: advancement to new exercises, tolerating therapy well, less palpable spasms in her lower back, minimal spasms in her lower spine, and using leg machines.

conditions rendered her permanently impaired under New York state guidelines and that she had lost her wage-earning capacity. (*Id.*)

### 3. The ALJ's Decision

At step one of the evaluation, the ALJ found that Stephenson had not engaged in substantial gainful activity since July 29, 2011, the onset date of her injuries. (Tr. at 31.) At step two, the ALJ found that Stephenson had seven "severe" impairments: degenerative disc disease and osteoarthritis of lower spine, spondylosis, obesity, asthma, hypertension, and diabetes mellitus. (*Id.*)

At step three, the ALJ found that Stephenson's impairments or combination of impairments did not meet or medically equal the severity of any of the listed impairments in the Act, 20 CFR §§ 404.1520(d), 404.1525 and 404.1526. (*Id.*) He noted that no physician had found evidence of nerve root compression, spinal arachnoiditis,[25] herniated discs, or lower spinal stenosis.[26] (Tr. at 32.) Further, although Stephenson suffered from bronchitis, there was no evidence of chronic bronchitis requiring physician intervention. (*Id.*) Overall, the ALJ noted that Stephenson had failed to document objective evidence that she was medically disabled within the meaning of the Act. (*Id.*)

Before conducting step four of the evaluation, the ALJ determined Stephenson's RFC by considering the medical evidence of Stephenson's severe and "non-severe" impairments, as well as Stephenson's age, education level, and past work experience. (*Id.*) The ALJ used a two-step analysis to determine Stephenson's RFC. (*Id.*) First, the ALJ determined whether there was an

---

[25] Arachnoiditis describes a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the spinal cord. *See* NINDS Arachnoiditis Information Page, NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE (Aug. 13, 2015), http://www.ninds.nih.gov/disorders/arachnoiditis/arachnoiditis.htm.

[26] Stenosis is the narrowing of a passageway in the body. *Spinal Stenosis*, MAYO CLINIC (Aug. 13, 2015), http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105.

11

underlying medically determinable physical or mental impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques, and that could reasonably be expected to produce Stephenson's symptoms. (*Id*.) Second, the ALJ evaluated the intensity, persistence, and limiting effects of Stephenson's symptoms to determine how they limited her functioning. (*Id*.) For this evaluation, where evidence was provided in the form of statements and opinions, the ALJ evaluated the credibility of such statements based on a consideration of the case record. (Tr. at 33.)

The ALJ found that Stephenson had an RFC to perform light work, but that she could only occasionally stoop and crouch and must avoid concentrated exposure to respiratory irritants such as dust, fumes, or gasses. (Tr. at 32.) He reviewed clinical records and opinion evidence as well as Stephenson's own statements, and found that Stephenson suffered from degenerative disc disease and osteoarthritis. (*Id*.) The ALJ found that the evidence did not support Stephenson's allegations of debilitating pain, noting that her degenerative changes were only mild, and that the treating and examining physicians found few physical findings or complaints. (Tr. at 34.)

At step four, the ALJ determined that Stephenson could perform past work because general cashier functions do not require the work-related activities precluded by Stephenson's residual functional capacity. (Tr. at 39.) At the fifth step of the evaluation, the ALJ found that Stephenson was not disabled. (Tr. at 40.) The ALJ considered Stephenson's age, education, work experience, and RFC, and followed the principles detailed in 20 CFR § 404.1520(f)). (*Id*.)

### III.      DISCUSSION

#### A.    Standard of Review

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3).

Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See*, e.g., *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48.) The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). The ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the

reviewing court to decide whether the determination is supported by substantial evidence."

*Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*. 728

F.2d 582, 587 (2d Cir. 1984)).

## B.    Determination of Disability

### 1.    Evaluation of Disability Claims

Under the Act, every individual considered to have a "disability" is entitled to disability

insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *See id.* §§ 416(i)(1)(A),

423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A claimant's

impairments must be "of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry: (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work

activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the

regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not,

determine whether the claimant possesses the RFC to perform his past work despite the

disability; and (5) if not, determine whether the claimant is capable of performing other work.

20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-part process; first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility

determination).  In determining whether there is any other work the claimant can perform, the

Commissioner has the burden of showing that "there is other gainful work in the national

economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)

(citation omitted).

### 2.  Improper Substitution of ALJ's own Assessment

A treating physician's opinion is entitled to "controlling weight" if it is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see

also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule

of deference").  The opinion of a claimant's treating physician is generally given more weight

than the opinion of a consultative physician, because the treating physician is likely "most able to

provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." *Id.*  An ALJ

who refuses to accord controlling weight to the medical opinion of a treating physician must

attempt to fill any clear gaps in the administrative record, especially where the claimant's

hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*,

537 F.3d at 139.

The ALJ must explicitly consider various "factors" to determine how much weight to

give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)

(citing 20 C.F.R. § 404.1527(c)(2)).  These factors include: (1) the length, nature, and extent of

the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the

consistency of the opinion with the entirety of the record; (4) whether the treating physician is a

specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the

opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

The ALJ is also required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion"). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion).

The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81. While the ALJ must follow specific guidelines to determine the weight of a treating physician's opinion, he is entitled to consider any "other factors brought to the Commissioner's attention that tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c).

### a. The ALJ selectively presented the evidence to undermine Plaintiff's claim.

Stephenson alleges that the ALJ "substitute[d] his own assessment of the relative merits of the objective evidence and subjective complaints for that of the treating physician throughout his decision." (Pl. Reply Mem. at 3.) The Court agrees. In several instances where a treating physician set forth objective medical evidence, the ALJ placed an emphasis on other factors less favorable to the Plaintiff. For example, the ALJ noted Dr. Scheinfeld's report that Stephenson

18

"walked with a normal gait." (Tr. at 35.) The ALJ, however, later noted Dr. Scheinfeld's findings that Stephenson walked with a stiff gait and found that this finding was in "stark contrast" with the findings of Dr. Schwalb and PA Waxman. (*Id.*) The ALJ did not explain the contrast. Similarly, the ALJ ignored the findings of at least three physical therapists, who independently concluded that Stephenson was between 75% and 100% impaired after examining her twelve times. (Tr.at 451-88.) Instead, the ALJ noted Dr. Scheinfeld's conclusion that Stephenson was 50% impaired. (Tr. at 37.) Furthermore, the ALJ ignored Dr. Miller's finding that Stephenson's soft tissue spinal conditions rendered her permanently impaired under New York state guidelines and that she had lost her wage-earning capacity, but pointed out that Dr. Miller labeled Stephenson as "mildly disabled." (Tr.at 882-85; Tr. at 36.)

### b. The ALJ did not give controlling weight to treating physician Dr. Scheinfeld and did not adequately justify that position.

Stephenson also argues that the ALJ: (1) did not give the proper weight to the evidence from Dr. Scheinfeld, and failed to follow the *Barnhart* test at several steps when determining the weight of Dr. Scheinfeld's opinion; and (2) that the ALJ did not explain why Dr. Scheinfeld's opinion was only given slight weight. (Pl. Mem. at 13.)

The Court agrees. The ALJ failed to properly balance the factors established in *Halloran v. Barnhart* when determining the weight to attribute to Dr. Scheinfeld's findings. *See id.* 362 F.3d at 32. At step one of the *Barnhart* test, the ALJ misrepresented the length of Stephenson's treatment with Dr. Scheinfeld. (Tr. at 34-38.) According to the Act, a medical opinion is given more weight when "a treating source has seen [a patient] a number of times and long enough to have obtained a longitudinal picture of [her] impairment." 20 C.F.R. § 404.1527. Generally "the longer a treating source has treated the claimant, and the more times the claimant has been seen by a treating source, the more weight the Commissioner will give to the source's medical

opinion." *Burgess*, 537 F.3d at 129 (internal citations omitted). The ALJ must also "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Id.*

In this case, the ALJ only mentioned Dr. Scheinfeld's evaluations between August 2011 and December 2012 (Tr. at 37), although Dr. Scheinfeld saw Stephenson thirty-six (36) times between 2009, when Stephenson first injured her back, and 2012. (Pl. Mem. at 13.) This three-year treatment history on its face would seem to give Dr. Scheinfeld's opinion more weight. In this case, however, the ALJ stated that Dr. Scheinfeld's conclusions were not consistent: (1) with his examinations; or (2) the opinions of Dr. Miller, Dr. Manyam, and the evaluations of Dr. Schwalb and PA Waxman. (Tr. at 37.) The ALJ, however, did not "comprehensively set forth" his reasons for the weight assigned to Dr. Scheinfeld's opinions, despite the length of time Dr. Scheinfeld treated Stephenson. *See Burgess*, 537 F.3d at 129.

### c. Dr. Scheinfeld's examinations were not inconsistent.

At step two, the ALJ found that Dr. Scheinfeld's examinations were inconsistent. (Tr. at 31.) The ALJ noted in step three that Dr. Scheinfeld's conclusions that Stephenson was 75% to 100% disabled were not supported by substantial evidence, and that Dr. Scheinfeld reported minimal physical evidence and inconsistent physical findings to support this conclusion. (Tr. at 37.)

The Court finds that the ALJ did not cite specific inconsistences between Dr. Scheinfeld's findings and opinions. Rather, he cited the differences between Stephenson's reported symptoms, and Dr. Scheinfeld's observations. (Tr. at 35.) For example, Stephenson reported "feeling more mobile and steady after physical therapy." (*Id.*) Dr. Scheinfeld observed that Stephenson "had a stiff gait and lumbar spine tenderness, but . . . bilateral negative straight

leg raise tests." (*Id.*) While the ALJ stated that these findings contrasted to later reports, he did not specifically identify any contradictory findings made by Dr. Scheinfeld. (Tr. at 35-37.) Instead, the ALJ asserted that Dr. Scheinfeld's opinions were "not consistent with his examinations, which reflect only some physical findings." (Tr. at 37.) This is not accurate. Dr. Scheinfeld observed that Stephenson had a ". . . tenderness to the spine . . ." in November 2011, in May 2012, in September 2012, and again in December 2012. (Tr. at 35.) He also noted that Stephenson walked with a stiff gait on two of these occasions, and that she walked with a normal gait on one occasion, in November 2011. (*Id.*) Dr. Scheinfeld also consistently reported that Stephenson had lumbar spine tenderness. (*Id.*)

### d. The ALJ did not explain alleged inconsistencies with other examiners.

The ALJ found that Dr. Scheinfeld's reports were inconsistent with the opinion of another treating physician, Dr. Schwalb, and the opinions of PA Waxman, Dr. Miller, and Dr. Manyam. (Tr. at 35-37.) He stated that:

> Although the claimant alleges debilitating pain, the record does not substantiate these complaints. A review of the claimant's treatment history with her primary care provider, David Schwalb, M.D. and Dennis Waxman[,] a physician's assistant, evidences few physical findings or complaints by the claimant.

(Tr. at 34.) The ALJ's reasoning indicates that because Dr. Scheinfeld reported physical findings, and Dr. Schwalb and Waxman reported "few" findings, their respective evaluations are inconsistent. Without specific contradictions between the types of findings, the Court cannot evaluate the weight given to Dr. Scheinfeld's evaluations by the ALJ, which turn on the distinction of a generalized numeric description such as "few." (*Id.*) Furthermore, the ALJ diminished the weight given to Dr. Scheinfeld by comparing his number of findings to that of PA Waxman, but dismissed the findings of another PA, Vincent Lasalle, because Lasalle was not "a recognized medical source." (Tr. at 37.) Lasalle opined that Stephenson had a functional

21

capacity that was "reduced more than 50%." (*Id.*)  The ALJ did not explain why Lasalle was not

a recognized medical source.

Dr. Miller reported that Stephenson was capable of light work, and "may frequently lift,

carry, push, and pull ten pounds," and Dr. Manyam reported that Stephenson exhibited a full

range of motion and suffered "no limitations regarding physical activities of prolonged sitting,

standing, climbing stairs, pushing, pulling and carrying weight." (*Id.*)  The Second Circuit has

found an expert's opinion not substantial so as to undermine the opinion of the treating physician

"[w]here the expert described the claimant's impairments only as '[l]ifting, and carrying

moderate[,] standing and walking, pushing, and pulling and sitting mild,' giving an opinion

couched in terms 'so vague as to render it useless in evaluating' the claimant's residual

functional capacity." *Burgess*, 537 F.3d at 129 (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir.

2000)).  Furthermore, Dr. Miller did not perform a function-by-function assessment, as several

other experts, including Dr. Scheinfeld, had done throughout their evaluations of Stephenson.

The conclusions of other examiners are therefore not so substantial as to support the ALJ

undermining Dr. Scheinfeld's opinion.  The ALJ erred in not giving controlling weight to Dr.

Scheinfeld's findings, which were not inconsistent with substantial evidence in the record.

### 3.  Improper Evaluation of Stephenson's Credibility

A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R. §§

404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P

(clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular

and continuing basis).  The ALJ's assessment of a claimant's RFC must be based on "all relevant

medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the

opinions of treating and consultative physicians; and statements by the claimant and others

concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

The ALJ must make a credibility determination "in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) (citation and internal quotation marks omitted). When objective medical evidence supports subjective accounts of pain or limitation, an ALJ accords those subjective accounts of pain great weight. *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted). However, when a claimant's stated symptoms suggest a more severe impairment than the medical evidence displays, the ALJ weighs several evaluative factors to determine whether to credit the claimant's assertions. *Ortiz v. Astrue*, 875 F. Supp. 2d 251, 261 (S.D.N.Y. 2012). These factors include the claimant's daily activities, the nature of her symptoms, and any treatments received. *See* 20 C.F.R. § 416.929(c)(3); *see Barnwell v. Colvin*, No. 13 Civ. 3683 (HBP), 2014 WL 4678259, at *13 (S.D.N.Y. Sept. 19, 2014).

Stephenson argues that the ALJ erred by failing to perform the analysis listed in 20 C.F.R. § 404.1529, but instead "basing his credibility determination, in part, on [Stephenson's] RFC." (Pl. Mem. at 15.) She points to a prior case decided by ALJ Gonzales, where he erred in determining a claimant's RFC prior to evaluating his credibility. *Agapito v. Colvin*, No. 12 Civ. 210 (PAC)(HBP), 2014 WL 774689 (S.D.N.Y. Feb. 20, 2014). However, unlike in *Agapito*, in Stephenson's case the ALJ first expressly "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence," and then utilized credibility to determine Stephenson's RFC. (Tr. at 32.) In his opinion, the ALJ states:

> The above residual functional capacity is well supported by the medical evidence, the general conservative care received, by the opinions of the consultative examiner and the independent medical examiner, and by the claimant's acknowledged activities.

(Tr. at 39.) This statement does not clearly indicate that the RFC assessment was a basis for a finding of lack of credibility. The ALJ's decision discusses in detail the aspects of the record that contradict Stephenson's testimony, and explains which aspects of Stephenson's testimony he found credible. (*Id.*) Only after this analysis does the ALJ assess the remaining evidence relevant to Stephenson's RFC. (*Id.*) Although the ALJ appears to have used the correct framework, his evaluation was flawed.

The ALJ correctly analyzed the evidence in accordance with 20 C.F.R. § 404.1529 by considering Stephenson's allegations in relation to the objective medical findings. (Tr. at 33-38.) The ALJ found that Dr. David Schwalb's and PA Waxman's findings did not substantiate Stephenson's claim of disabling pain. (Tr. at 34.) In addition, he found that while Dr. Scheinfeld's report documented Stephenson's complaints of debilitating pain, his reports contained only some physical findings, and the treatment record reflected routine and conservative care, suggesting physical therapy and decreasing pain medication. (*Id.*) The ALJ also found that diagnostic testing did not support a finding of disability, as the X-rays and MRIs evidenced only mild abnormalities in Stephenson's lumbar spine. (*Id.*)

Although the ALJ found that the medical evidence failed to support a disability finding, the ALJ is required to evaluate other evidence to determine Stephenson's credibility, including: (1) plaintiff's "daily activities;" (2) "location, duration, frequency, and intensity" of Stephenson's symptoms; (3) "[f]actors that precipitate and aggravate" Stephenson's symptoms; (4) "type, dosage, effectiveness, and side effect of any medication" plaintiff takes for her symptoms; (5) other treatment Stephenson received for relief for her symptoms; and (7) "[a]ny

other factors" regarding Stephenson's limitations resulting from her symptoms. *See Barnwell*,
2014 WL 4678259 at \*13; *See also Ortiz*, 875 F. Supp. at 261. The ALJ, however, did not
properly evaluate this additional evidence.

First, the ALJ mischaracterized Stephenson's daily activities.  For instance, the ALJ
stated that Stephenson took walks and rode her bicycle, but Stephenson's actual testimony was
that she could only ride her bicycle slowly for short periods of time on flat surfaces, and that she
could only walk for ten minutes at a time. (Tr. at 81-85.)  Stephenson conducted these activities
"as much as possible to keep active." (Tr. at 38.)

The ALJ stated that Stephenson "engage[d] in a wide range of activities of daily living,"
including preparing meals, taking care of pets, and light housework. (*Id.*)  He pointed out that
Stephenson dressed and bathed herself.  He also pointed out that Stephenson was planning to
return to school.  The ALJ characterized such activities as "inconsistent with her allegations of
disability." (*Id.*)  None of these activities, however, are inconsistent with Stephenson's
testimony that, for example, "sometimes after physical therapy I can't even get up in the
morning." (Tr. at 62.)  Nor is it inconsistent with Stephenson's testimony that she experienced
excruciating pain, numbness in her legs, or difficulty standing or walking. (Tr. at 62-63.)  In
fact, Stephenson testified that she could not stand for long periods of time or sit for long periods
of time. (Tr. at 78.)  While Stephenson did testify to her education plans, she stated that she
desired to take home courses, so that she did "not have to worry about lifting on [sic] the books."
(Tr. at 77-78.)

Second, the ALJ incorrectly evaluated the intensity, persistence, and limiting effects of
Stephenson's symptoms. (Tr. at 38-39.)  The ALJ simply indicated that Stephenson's assertions
of debilitating pain were not substantiated by the objective evidence and were inconsistent with

the other non-medical evidence.  (Tr. at 34); 42 U.S.C. § 423(d)(5)(A).  However, the ALJ

pointed to no objective medical evidence to illustrate his point.  He merely stated that

Stephenson "appear[ed] to have exaggerated her functional limitations and level of pain" because

she would "consistently 'offer no complaints' [sic] Dr. Schwalb, and Dennis Waxman P.A., and

conversely report debilitating pain to Dr. Scheinfeld."  (*Id.*)  However, Stephenson testified that

"sometimes the pain is excruciating," while other times it "calmed down through physical

therapy."  (Tr. at 18-20; *see also* Tr. at 37.)  Given that Stephenson saw Dr. Scheinfeld more

regularly than Dr. Schwalb or PA Waxman, Dr. Scheinfeld had more opportunities to observe

the pain differentials.  The ALJ was required to fully evaluate the limiting effects of

Stephenson's symptoms in addition to objective medical evidence. *See Simmons,* 982 F.2d at 56.

Stephenson did not claim the pain was continuous, only that it was "excruciating" when present.

The ALJ, however, did not appear to consider the effect of the pain when it was active.

Finally, the ALJ failed to properly evaluate the "type, dosage, effectiveness, and side

effect of any medication" and any other treatment Stephenson took for her symptoms.  While the

ALJ mentioned in his opinion that Stephenson took pain medication, he did not detail the type,

dosage, or side effects of the medication.  (Tr. at 37.)  Further, while the ALJ mentions in his

medical evaluation that Stephenson attended physical therapy, he did not evaluate it as treatment

for her pain.  (*Id.*)  By omitting the type, dosage, effectiveness and side effects of any

medication, and other treatment for relief, the ALJ mischaracterized Stephenson's overall

treatment, leading him to evaluate her credibility incorrectly.

The ALJ's findings therefore do not accurately reflect Stephenson's limitations resulting

from her symptoms and are not supported by substantial evidence.  "Credibility findings of an

ALJ are entitled to great deference and . . . can be reversed only if they are 'patently

unreasonable,'" *Pietrunti v. Director, Office of Workers' Compensation Programs,* 119 F.3d 1035, 1042 (2d Cir. 1997)).  Because the ALJ mischaracterized Stephenson's daily activities as inconsistent with her disabilities, his findings related to such activities are "patently unreasonable." *See id.* at 1042.

### 4.  The ALJ's Failure to Use a Vocational Expert

The ALJ determined that Stephenson's RFC of light exertion allowed her to resume her previous work as a cashier. (Tr. at 39.)  In making this determination, the Court finds that the ALJ did not use a vocational expert, or adequately justify the failure to use one.  First, the ALJ failed to fully evaluate the relevant physical and mental demands of Stephenson's job at Wal-Mart.  At the hearing, the ALJ did not ask Stephenson details about her job requirements as a Wal-Mart cashier.  While he asked Stephenson to detail a personal disagreement leading to her termination, the ALJ did not discuss her daily job duties in her hearing or in his decision.  In place of detailed information about Stephenson's actual job duties, the ALJ used the *Dictionary of Occupational Titles* ("*DOT*") [27] from the U.S. Department of Labor.  (*Id.*)

Consultation with a vocational expert is not required in every case.  *See Collins-Maat v. Bowen*, 690 F. Supp. 664, 669-70 (holding that so long as sufficient evidence exists to determine whether disability claimant's asserted limitations significantly diminish employment opportunities otherwise available, use of vocational expert is left to the discretion of ALJ); 20 C.F.R. § 404.1566(c)(5); 42 U.S.C.A. App; 20 C.F.R. § 404.1566, ("[w]e will decide whether to use a vocational expert or other specialist").

---

[27] The Dictionary of Occupational Titles (DOT) was created by the Employment and Training Administration and was last updated in 1991.  It is included on the Office of Administrative Law Judges (OALJ) web site because it is a standard reference in several types of cases adjudicated by the OALJ, especially in older labor-related immigration cases.  www.oalj.doj.gov.

Because Stephenson had nonexertional limitations (inability to reach, crouch, and stoop)[28], the ALJ should have consulted a vocational expert. *Cf Paulino v. Colvin*, No. 13, Civ. 3718, 2014, WL 2120544, at *19 (S.D.N.Y. May 13, 2014); *see also* 20 C.F.R. §§ 416.945–.969a. The ALJ's failure to do so requires remand.

## IV. CONCLUSION

For the reasons set forth below, Stephenson's motion is **GRANTED,** the Commissioner's motion is **DENIED**, and the case is **REMANDED** for further proceedings. This resolves Doc. Nos. 13 and 20.

**SO ORDERED this** 12th **day of January 2016.**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

---

[28] The SSA includes "reaching, handling, stooping, climbing, crawling, or crouching" as nonexertional limitations. Social Security Administration, Program Operations Manual System (POMS), DI 24515.063 Exertional and Nonexertional Limitations, https://secure.ssa.gov/poms.nsf/lnx/0424515063.